## Simpson et al. v. Simpson et al.

Dec. 9, 1938.

OLIVER POPPLEWELL and C. C. BAGBY for appellants.

MOORE & PITTMAN for appellees.

OPINION OF THE COURT BY SIMS, COMMISSIONER—Affirming.

Harrison Simpson, a resident and citizen of Casey County, died March 20, 1932, leaving a will, wherein he devised his entire estate to be equally divided among his eight children. In this will he named two of his sons, W. H. Simpson and Cannon Simpson, executors. After waiting for more than two years for the executors to settle decedent's estate, their brother Lloyd Simpson, joined by his wife, brought this suit against the two executors and all the devisees under Harrison Simpson's will to sell the real estate, pay decedent's debts, to require the executors to settle their account with the

master commissioner and to divide the net proceeds of the estate among the devisees.

During this litigation, W. H. Simpson and Cannon Simpson, each proved a claim against the estate in the sum of $500 and filed same with the master commissioner, the basis of each claim being a note for $500 alleged to have been executed by their father to each claimant on September 7, 1931. The master commissioner allowed these two notes as proper claims against the estate and Lloyd Simpson filed exceptions to the report of the master commissioner attacking the allowance of these notes on three grounds: (1) There was no consideration to support them; (2) the decedent did not sign either of the notes; (3) neither of the notes has been listed for taxation by the holders thereof, therefore they could not be collected. After hearing considerable proof, the learned chancellor sustained the exceptions filed to the master commissioner's report allowing these two notes as valid claims against the estate, and judgment was entered denying W. H. and Cannon Simpson any recovery on the notes. It was further adjudged W. H. and Cannon Simpson, executors of the estate of Harrison Simpson, must reimburse the estate in the sum of $200 which the executors paid W. H. Simpson as a credit on the $500 note he held; also, these executors must reimburse the estate in the sum of $100 they paid Cannon Simpson as credit on the $500 note he held. This appeal is prosecuted by W. H. and Cannon Simpson individually, and as executors of the estate of Harrison Simpson, to reverse this judgment.

As the judgment must be affirmed on the ground that neither of these two $500 notes, executed to W. H. and Cannon Simpson by their father, is supported by any consideration, it will not be necessary for us to discuss the plea of non est factum, or the plea the holders of the notes failed to list them for taxation.

Harrison Simpson owned considerable land, but it must not have been very valuable as his estate amounted to only some $4,000 and his indebtedness does not appear to have been large. W. H. Simpson lived on his father's farm and had been the recipient of considerable aid from the old gentleman. Cannon Simpson appears to have been better educated than the other children and he has been living at Hamilton, Ohio, since about 1922, where he worked for the Ford Motor Company, but was

doing little better than earning a living for himself and family. He came to Kentucky in September, 1931, to visit his brother, W. H. Simpson, and it was at this brother's home on September 7, 1931, that their father, so W. H. and Cannon Simpson testify, signed these two notes, no one being present but the father and these two sons.

Lloyd Simpson attacked these notes with the pleas of non est factum; want of consideration; and that the holders of the notes failed to list them for taxation. The plea of non est factum put the burden on the holders of the notes to prove that Harrison Simpson signed them. Radford's Adm'rs v. Harris, 144 Ky. 809, 139 S. W. 963; Courtney v. Dunning, 201 Ky. 242, 256 S. W. 411. The plea of lack of consideration places the burden of proof on the party making this plea. Radford's Adm'rs v. Harris, supra; Cheney's Adm'r v. Houston, 238 Ky. 410, 38 S. W. (2d) 198. Hence, it is seen W. H. Simpson and Cannon Simpson as the holders of these two notes had the burden of proving Harrison Simpson signed them, while the burden was on the plaintiff, Lloyd Simpson, to prove lack of consideration for the execution of these notes. Therefore, W. H. and Cannon Simpson testified first. After testifying Harrion Simpson signed these notes, W. H. and Cannon Simpson did not rest their case and require the plaintiff, Lloyd Simpson, to come forward with his proof to show the notes were not supported by any consideration. On the contrary, W. H. and Cannon Simpson went right on and testified relative to the consideration supporting the notes. As we shall later see, this testimony given by them in their effort to show these notes were supported by a consideration proved conclusively there was no consideration for the execution of these two notes. Neither W. H. nor Cannon Simpson was competent to testify for himself against decedent's estate, Civil Code of Practice, Sec. 606, subd. 2, but each was a competent witness for the other. We will turn to the record and detail in narrative form the testimony of each of these brothers in their effort to show the $500 notes their father executed to the other was supported by a consideration. In proving these two notes against the estate, W. H. and Cannon Simpson filed copies thereof and did not file the original notes with their respective proof of claim, and the court issued a rule against them requiring each to produce the note he held. Again, these two

executors paid claims against the estate which were not proven as provided by Sec. 3870, Kentucky Statutes, saying they did so because they knew such claims were owing. The record shows that about two years after the death of Harrison Simpson, his son, W. H. Simpson, one of the executors of his father's estate, bought a dog license for $2 and charged same to the estate and when asked why he did this, replied, "It was the estate's dog," but admitted when he moved the dog followed him and his family to their new home. He further said he bought this dog tag in an attempt to comply with the law. We cite such instances, as we think they give a good picture as to what character of man W. H. Simpson is and thereby enable us to weigh his testimony accurately.

W. H. Simpson testified there was not much said by his father when he executed these two $500 notes; that the old gentleman directed Cannon to write the notes; that he signed both notes at the same time; that he heard his father say on several occasions that he was indebted to Cannon and that this indebtedness consisted of checks the father had drawn on Cannon's bank account at the People's Bank in Hustonville, Ky. W. H. Simpson produced a good many checks, signed "C. Simpson, by H. Simpson." But, when Mr. Tapscott, cashier of this bank, took the stand, he testified the old man opened this bank account in Cannon's name as he was having some domestic troubles about that time, and the bank would not have honored a check drawn on this account by Cannon Simpson, because he had never had an account with this bank. Mr. Tapscott's evidence shows conclusively this bank account was Harrison Simpson's and he carried it in the name of Cannon Simpson for his own convenience.

We will not discuss Cannon Simpson's testimony in favor of his brother, W. H. Simpson, because we can quote three excerpts from his testimony which will themselves show there was no consideration whatever supporting the $500 note Harrison Simpson executed to his son, W. H. Simpson. On page 75 of the record Cannon testified as follows:

"Q. What did he give it for? A. I can't answer that, I don't know. * * *

"Q. And you don't know why your father gave

Bill that note and you were present at the time and saw them? Tell the court why he gave Bill that for. A. I don't know.

"Q. Did you hear him say? A. No sir.

"Q. Did Bill say? A. I didn't ask him—it was none of my business.

"Q. Who else was present? A. My father, my brother and myself. * * *

"Q. Bill's was given for the same purpose yours was given? A. I can't say.

"Q. Wasn't that what your father said? A. He didn't say anything about it."

Cannon never mentioned to his brothers or sisters the fact his father had executed these notes, and the first the other children ever heard of the notes was when they were proven against the estate. When W. H. Simpson was asked why he did not inform the other heirs that he and Cannon held these notes, he replied that he didn't think it was any of their business. No other persons testified for the executors concerning the matter of consideration supporting these two notes. In contesting the payment of these two notes Lloyd Simpson testified his father did not owe Cannon $500 and he never heard Cannon claim his father was indebted to him, that Cannon was living from "hand to mouth." Jolly Simpson in testifying against his brothers, W. H. and Cannon Simpson, said their father had to help Bill and that Bill would not work at home and for this reason he (Jolly) had to go to his father's assistance in operating the farm. We realize this record shows Lloyd cashed checks on his father he knew to be forged; that he sold his father's cow and kept the money; and that he was put in jail for transporting a mortgaged car into Kentucky. Of course, such conduct impeaches Lloyd's testimony, but we are not deciding this case on Lloyd's testimony nor on the testimony of his brother, Jolly. The testimony of W. H. and Cannon Simpson would convince any fair mind there was no consideration supporting these two notes which they testified their father executed to them. Having reached the conclusion these notes were not supported by any consideration it is unnecessary for us to decide whether Harrison Simpson signed them or whether his signature was forged to

these two notes by his son, Cannon, as charged by Lloyd.

Counsel for appellants argue great weight should be given the ruling of the master commissioner allowing these two notes as proper claims against the estate. They cite us Crow's Adm'r v. Crow, 4 Ky. Law Rep. 909, and Frazier v. Cavanaugh's Adm'r, 4 Ky. Law Rep. 711, holding that a settlement made in the county court is prima facie evidence as to the correctness of the administrator's accounts, and they argue such evidence is entitled to the greatest weight. We have never heard before that prima facie evidence is entitled to great weight. We have always thought prima facie evidence only apparently established a case and was subject to explanation and could be overcome by rebuttal, and we are still of that opinion. While the findings of the master commissioner may be entitled to some weight, the chancellor found the evidence did not support the findings of the master commissioner, therefore, he overturned them. This record convinces us the master commissioner was in error when he allowed these notes as proper claims against the estate and that the chancellor was correct in refusing to allow them.

The judgment is affirmed.